UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EASTERN FINANCING CORPORATION,

Plaintiff,

- against -

JSC ALCHEVSK IRON AND STEEL WORKS,

Defendant.
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/24/2008

04 Civ. 8112 (RPP)

**OPINION AND ORDER**

**ROBERT P. PATTERSON, JR., U.S.D.J.**

On June 7, 2007, Defendant JSC Alchevsk Iron and Steel Works ("Alchevsk") moved to

set aside the default judgment entered against it by this Court on May 13, 2005 for $1,411,707.00

plus prejudgment interest in the amount of $921,138.81, for a total of $2,332,845.81; and it

moved to dismiss the complaint filed against it by Plaintiff Eastern Financing Corporation

("EFC") on October 15, 2004. Defendant claimed, *inter alia*, that the judgment was procured by

fraud on the Court.

After hearing argument on Defendant's motion on August 29, 2007, the Court ordered an

evidentiary hearing, which was held on November 20 and 21, 2007, and on December 12, 2007.

After review of the argument, the testimony at the evidentiary hearing, the exhibits admitted into

evidence, the declarations, the documentary exhibits submitted by the parties, and the proposed

findings of fact and conclusions of law submitted by the parties, the Court makes the following

findings of fact and conclusions of law relating to the Defendant's motion.

## BACKGROUND

### I. The Underlying Facts and Proceedings

Sam Kislin, President of Plaintiff EFC and a native of Ukraine, then a part of the Soviet Union, immigrated to the United States in 1973. (Tr. 11/20/07 at 71, Kislin Decl. at ¶ 5.) Mr. Kislin has engaged in business in Eastern Europe through several companies: 1) Trans Commodities Inc. ("TCI"), a New York corporation incorporated in 1990 (Kislin Decl. ¶ 7); 2) EYA Davidson, a Lichtenstein corporation, formed in 1993, for tax considerations upon the advice of Mr. Kislin's attorney, Mr. George Benninger (Tr. 12/12/07 at 4-5, Kislin Decl. ¶ 8); 3) Eastern Financing Holding Limited ("EFHL"), a company organized in the British Virgin Islands and registered to do business in Monaco (Kislin Decl. ¶ 9); and 4) Plaintiff, EFC, a Delaware corporation formed in 1994, which has offices in New York. (Kislin Decl. ¶ 7.) In the 1990s, Mr. Kislin evidently held the title Investments Director of EYA Davidson. (See Abramtseva Decl., Ex. E at 4.)

On August 2, 1995, EYA Davidson Trading Establishment ("EYA Davidson"), a Lichtenstein company established in 1993 and dissolved on April 15, 1997, entered into a barter contract signed by its president, George Benedgere, to supply raw materials to Alchevsk in return for delivery in Ukraine to EYA Davidson of finished steel products by Alchevsk. (Declaration of Alla Abramtseva, dated May 25, 2007 ("Abramtseva Decl.") at Ex. B; Declaration of Sam Kislin, dated August 7, 2007 ("Kislin Decl.") at ¶ 13.) The contract was drafted by Vladimir Lemberg, a representative of EYA Davidson located in Ukraine (Kislin 11/20/07 Tr. at 94-95), written in Russian, executed by both parties in Ukraine, and all deliveries of goods or materials under the contract were to take place in Ukraine. (Abramtseva Decl., ¶¶ 11-12.) Plaintiff EFC is not a

2

party to the contract or mentioned in it. (Abramtseva Decl., Ex. B.) Alchevsk defaulted on some

of its obligations under the Contract in 1996.

Section 6 of the Alchevsk / EYA Davidson barter contract states:

16.1. All disputes arising in connection with the performance of the present Contract, if not settled amicably, shall be submitted for consideration and final resolution by the International Commercial Arbitration Court with the Ukrainian Chamber of Commerce and Industry in Kiev as prescribed by its Rules of Procedure. The judgments made by such Court shall be final and binding for both parties.

Abramtseva Decl., Ex. B, ¶ 6.

The contract also contains provisions 7.1 and 7.3 stating:

7.1 Neither Party shall have the right to transfer its rights and obligations under the present Contract to any third parties without a written consent by the other Party.

7.3 Upon signing of the present contract all previous negotiations and correspondence related to the contract herein shall be deemed null and void.[1]

Id. ¶ 7.

In 1997, Mr. George Benninger, the general counsel in New York for Mr. Kislin's

companies, acting on behalf of EYA Davidson, hired a Ukrainian attorney, Oleg Y. Alyoshin of

Vasil Kisil & Partners, to commence arbitration proceedings on behalf of EYA Davidson to

collect Alchevsk's debt to EYA Davidson. (Tr. 12/12/07 at 15-23; Kislin Decl. ¶ 18.) On April

14, 1997, the day before the dissolution of EYA Davidson, Mr. Alyoshin filed a claim on behalf

of EYA Davison with the International Commercial Arbitration Court at the Ukrainian Chamber

---

[1] In its proposed findings of fact and conclusions of law, the Defendant also relies on claims of lack of personal jurisdiction of the Defendant. Because the Court does not reach Defendant's claim that this Court did not have personal jurisdiction over Defendant, the Court will not attempt to determine the effect of such a clause on New York long-arm jurisdiction.

of Commerce (hereinafter the "Arbitration Court") seeking $1,411.701.96 from Alchevsk. (Abramtseva Decl. at ¶ 14, Ex. C; Kislin Decl. at ¶ 18.)[2,3]

On July 29, 1997,[4] EYA Davidson and Alchevsk entered into Supplementary Agreement No. 3 pursuant to which Alchevsk acknowledged its debt in the amount of $1,404,711.96 to EYA Davison, and promised to deliver steel plates of that value in September and October 1997. (Abramtseva Decl., Ex. B.)

On September 10, 1997, a bankruptcy proceeding regarding Alchevsk was initiated in a different court from the arbitration proceeding, the Arbitration Court in the Lugansk Region, now called "The Economic Court" (hereinafter referred to as "the Bankruptcy Court")[5]. (Abramtseva Decl. ¶ 17.) In October 1997, Mr. Benninger, as incorporator and general counsel to EFHL, appointed Mr. Alyoshin to institute legal proceedings by EFHL as successor in interest to EYA Davidson. (Id., Ex. E at 7.)

On December 15, 1997, Mr. Alyoshin filed a breach of contract claim in the "Bankruptcy Court" on behalf of EFHL as successor in interest to EYA Davidson (stating that EFHL would also be referred to as "Eastern Financial Corporation" or "Claimant") for $1,411,706.96. (Abramtseva Decl., at ¶ 17, Ex. F at 1; Kislin Decl. at ¶¶ 18, 21.) Notices and correspondence

---

[2] In the fall of 1997, Mr. Lemberg notified the Arbitration Court that EYA Davidson had been liquidated on April 15, 1997, and that EFHL was its successor in interest. (Abramtseva Decl., Ex. E at 3.) An issue arose as to the authenticity of EFHL's rights of succession, and in November 1997, Mr. Lemberg requested a postponement to perfect the claim. (Abramtseva Decl., Ex. E at 5.) On December 25, 1997, Mr. Alyoshin submitted a petition on behalf of Eastern Financial Holdings Limited (referred to in the petition as "Eastern Financial") to substitute it as the plaintiff in the arbitration proceeding. (Abramtseva Decl., Ex. D at 1.)

[3] Mr. Lemberg had requested that all case material should be sent to Trans Commodities, Inc. in Kiev. (Abramtseva Decl., Ex. E. at 6.)

[4] The document was signed by EYA Davidson on July 29, 1997, even though EYA Davidson supposedly had been dissolved and its assets transferred to EFHL on April 15, 1997.

[5] The International Commercial Arbitration Court handling the arbitration proceedings entitled its decisions "Arbitration Court." The court handling bankruptcy decisions also called itself the "Arbitration Court," and subsequently the "Economic Court." For differentiation purposes, the court handling the bankruptcy proceeding is

4

with respect to the claim were to be sent to "the representative of Eastern Financial Corporation in Ukraine, Mr. Volodymyr B. Lemberg, at 18/24, Dmytriyevksa Street, 8th Floor, Kyiv, 252054." (Abramtseva Decl., Ex. F at 4.)

On December 25, 1997, the "Arbitration Court" received a petition from Mr. Alyoshin on behalf of EFHL to be substituted as plaintiff for EYA Davidson. (Abramtseva Decl. at ¶ 15, Ex. D at 1, Ex. E at 5.) On January 16, 1998, after granting EFHL an adjournment to authenticate certain of its documents authorizing Mr. Alysohin to bring the proceeding, the "Arbitration Court" found that EFHL had not shown that the Directors of EFHL granted Mr. Benninger the power to authorize Mr. Alyoshin to represent EFHL; therefore, the "Arbitration Court" dismissed the arbitration proceeding, charging all arbitration fees to the plaintiff's (EFHL's) account.[6] (Abramtseva Decl. at ¶ 16, Ex. E.)

On June 10, 1998, however, the "Bankruptcy Court" issued a decision finding that EFHL was the successor in interest to EYA Davidson, and acknowledging the claims of EFHL against Alchevsk in the undisputed amount of $1,411,706.96. (Abramtseva Decl., Ex. G.) Plaintiff has acknowledged receipt in 1998 of this decision by the "Bankruptcy Court." (Kislin Decl. at ¶ 22, Ex. A.)

Thereafter, Mr. Alyoshin's law firm ceased representing EFHL. Mr. Kislin states that Mr. Alyoshin resigned because he was being retained by Alchevsk. (Kislin Decl. ¶ 23-24.) Although Mr. Kislin learned that EFHL's claim of $1,411,706.96 against Alchevsk had been acknowledged by the "Bankruptcy Court," Mr. Kislin did not retain another Ukrainian attorney to replace Mr.

referred to as the "Bankruptcy Court" in this opinion.
[6] Mr. Benninger's testimony that EFHL had not been provided with the normal opportunity "to provide proof of authority" prior to disallowance of the claim (12/12/07 Tr. at 12) is contradicted by facts stated in the opinion of the Arbitration Court. (Abramtseva Decl., Ex. E. at 5-6)

5

Alyoshin, because, according to Mr. Kislin, he "came to the conclusion that in Ukraine, I will never get this justice."[7] (11/20/07 Tr. 102.) Mr. Kislin has admitted that he currently does business in Ukraine, enters into contracts in Ukraine, and has hired lawyers in Ukraine since 1998. (Id.)

On December 25, 2003, Alchevsk sought to emerge from bankruptcy, by entering into an Amicable Agreement with its duly constituted Committee of Creditors and its parent corporation, Industrial Union of Donbass (IUD), by which each creditor would be paid 15% of its approved claim in cash by Alchevsk, and 85% of its approved claim by IUD through transfer of securities. (Abramtseva Decl., ¶ 20-21, Ex. H at 2.) In the Amicable Agreement, EFHL was correctly listed as a creditor of 4th priority with an approved claim of $1,411,706.96, and with the postal address of one of its agents: "c/o Moore Stephens Service SAM, L'Estoril, Blok C 31, Avenue Princess Grace, MC 98000, Monaco." (Abrametseva Decl., Ex. H at addendum #1.)

On January 22, 2004, the "Bankruptcy Court" entered a judgment approving the Amicable Agreement's settlement of the approved claims of creditors, including EFHL's claim for $1,411,706.96. (Abramtseva Decl., Ex. I.) The court ordered the settlement of the creditor claims by March 1, 2004. (Id.) On March 1, 2004, Mr. Kislin, as President of EFHL, assigned all claims of EFHL against Alchevsk to EFC. (Kislin Decl., Ex. B.)

In 2004, Mr. Kislin approached Mr. Jeffrey Dannenberg, of Kestenbaum, Dannenberg & Klein, LLP, about initiating an action for breach of contract on behalf of EFC against Alchevsk. (Tr. 11/20/07 at 7-10, 74-76.) On October 15, 2004, Plaintiff commenced this action in this Court against Alchevsk by filing a complaint, verified by Mr. Kislin, seeking damages for breach

---

[7] After the conclusion of the evidentiary hearings and with objection from the Defendant, Plaintiff EFC asked this Court to take judicial notice of Country Reports on Human Rights Practices in Ukraine. The Court finds that these

6

of contract, plus interest from December 31, 1997. (Compl. ¶¶ 17-19.) The verified complaint

was served on Alchevsk pursuant to the Hague Convention on February 9, 2005. (Tr. 11/20/07 at

13.)

On February 11, 2005, Ms. Abramtseva, Chief of Legal Department of Alchevsk, sent

Mr. Dannenberg the following email:

> Dear Jeffrey C. Dannenberg,
> OJSC "Alchevsk Iron & Steel Works" (hereafter "AMK") received the summons of the US District Court on civil cases and primary allegation of Eastern Financing Corporation. According to this fact we ask you to take into account the following:
>
> On August 2, 1995 the Contract No. 108/5-73 between "AMK" and "EYA Davidson Trading Establishment" company was signed. Arrears of "AMK" in favor of "EYA Davidson Trading Establishment" against the mentioned Contract is 1.414.707,00 USD.
>
> "AMK was informed that EYA Davidson Trading Establishment" had been liquidated and "Eastern Financial Holding Limited" Corporation had become the Assignee of "EYA Davidson Trading Establishment." In 1997 "Eastern Financial Holding Limited" Corporation applied to International Commer-cial [sic] Arbitration Court under Ukrainian Chamber of Commerce and Industry, Kiev (heraf-ter [sic] ICAC under UCCI) with the claim to pay the arrears against the Contract. According to the decision of ICAC under UCCI dated January 16, 1998 on matter AC No. 264y/97 arbi-tral [sic] justice was terminated in view of the fact that "EYA Davidson Trading Establishment" was liquidated at the moment. "Eastern Financial Holding Limited" Corporation couldn't prove its succession on the matter. Later "AMK" made attempts to hold the negotiations, but postings with inquiries sent to representative office of "Eastern Financial Holding Limited" Corporation, Odessa, Ukraine remained without reply.
>
> Besides we ask you to answer the following questions concerning the claim.
>
> 1. Why was the claim declared to US District Court, NY?
> According to item 6.1 of the Contract No. 108/5-73 between "AMK" and "EYA Davidson Trading Establishment" company all the arguments and disagreements against the Contract (if they could not be settled amicably) should be committed to International Commercial Ar-bitration [sic] Court under Ukrainian Chamber of Commerce and Industry, Kiev. Your legal justification and the place of court examination are not corresponding to the Terms of the Contract.

general reports on the Ukraine are not shown to be relevant to the events in this action.

2.  Why have you advanced a civil claim and the Court agitated the civil trial? Civil claims and trials are proper for disagreements between individual persons (citizens and unallowable for court examination of between legal persons (enterprises).

3.  Why is there in the claim no proof of the fact that "Eastern Financial Holding Limited" Corporation had become the Assignee of "EYA Davidson Trading Establishment" is indicated? Without these proofs we will not acknowledge your rights to claim the payment of arrears by our enterprise.

4.  It is mentioned that we should appear before the court within twenty (20) days after service of this summons upon us. But we will not be able to organize the trip to USA in such a short period of time (visas). Is it possible to send our explanations at the claim via post? If positive where to: to you or to the Court?

5.  Perhaps "Eastern Financial Holding Limited" Corporation has its representative offices in Ukraine or Russia. Is it possible to hold negotiations about the adjustment of disagreement with such representative office, if any?

Best Regards,
Alla Abramtseva

(Abramtseva Decl., Ex. J.)

On February, 18, 2005, Mr. Dannenberg, after meeting with Mr. Kislin about Ms.

Abramtseva's email (11/20/07 Tr. at 15, 48), sent the following email in response to Ms.

Abramtseva:

Thank you again for your recent communication regarding the action that has been commenced in the U.S. District Court in New York. I will attempt to respond to your inquiries as follows:

I cannot explain why your company was unable earlier to hold negotiations with representatives of Eastern Financial Holdings Limited Corporation, but that company is affiliated with Eastern Financing Corporation (the plaintiff in the pending action). Indeed, the claim made in the pending action brought in New York (U.S. $1,411,707) arises from the same matter as the claim upheld by that Arbitration Court in 1998. The present claim has been brought in New York because there already were proceedings held before the Arbitration Court in Ukraine, but no collection was made on the resulting Award, so now an attempt is being made to enforce the claim in the United States. Under

U.S. law and procedure, there is no bar to the commencement of civil claims against corporations or other business entities.

If your company is, in fact, prepared to conduct negotiations over this matter, we will agree to place the pending action on hold temporarily. The current status of the action is that the Court has scheduled what is called a Case Management Conference, at which representatives of both sides would be expected to appear (but for an intervening resolution by settlement) on April 7, 2005.

I am fully authorized to negotiate the possible adjustment of the claim. If you woud [sic] prefer to speak with someone local, Eastern Financial Holdings Limited Corporation/Eastern Financing Corporation has a representative office in Kiev, and I could refer you to an individual there. Please let me know by return email how you would like to proceed.

Jeffrey C. Dannenberg

(Dannenberg Decl., Ex. A.)

Mr. Dannenberg received no reply, and on April 25, 2005, he filed a motion for a default

judgment, dated April 20, 2005, along with a Declaration of Service on Alchevsk by the United

States Postal Service dated April 20, 2005.[8] In his motion for default judgment, Mr. Dannenberg

submitted a Declaration stating the following, *inter alia*, to the Court:

This action was commenced by the filing of a Complaint with, and issuance of a Summons by, the Clerk of the Court on October 15, 2004. The Complaint, a copy of which is annexed hereto as Exhibit A, was verified by Mr. Sam Kislin, plaintiff's Chief Executive Officer, sets forth the facts upon which an obligation arose on the part of defendant to plaintiff as a result of certain goods sold and delivered. The amount of that obligation as of December 31, 1997 was $1,411,707.00. In the Complaint, plaintiff seeks a money judgment for that indebtedness, plus interest (at New York's statutory rate of 9% per annum) from December 31, 1997...

On February 11, 2005, I was contacted by Ms. Alla Abramtseva, Chief of defendant's Legal Department, who acknowledged to me that defendant had, in fact, received the Summons and Complaint and requested, among other things, whether there was a possibility that both sides could conduct negotiations in an attempt to settle plaintiff's claim. I responded on February 18, indicating to Ms. Abramtseva that plaintiff was not

---

[8] The notice of motion for default judgment reflects service by mail of the untranslated motion on Alchevsk, but not on Alchevsk' Legal Department, nor was service addressed to Ms. Abramtseva's attention. (See Notice of Mot. for Default J. (Doc. # 14))

opposed to discussing settlement. However, I was not asked for, and I did not consent to, any extension of defendant's time to answer the Complaint, and I specifically informed Ms. Abramtsesva [sic] of the Court's having scheduled Case Management Conference to be held on April 7, 2005.

(Dannenberg Decl. Supp. Mot. Default J. ¶¶ 2, 4.)

Mr. Dannenberg did not supply the Court with a copy of Ms. Abramtseva's email of February 11, 2005, and did not inform the Court that: 1) in her email, Ms. Abramtseva said that the contract was not between Plaintiff and Alchevsk, but between EYA Davidson and Alchevsk, that she had asked why there was no mention that the claim had been assigned to EFHL, another foreign corporation in 1997, and that Alchevsk contested this Court's jurisdiction because the contract required arbitration in Ukraine of all disputes arising thereunder; 2) that the Defendant's representatives would not be able to personally appear in Court within 20 days after service of the summons; 3) that Ms. Abramtseva inquired if she could present her explanations of the claim by letter to the Court; and 4) that Mr. Dannenberg failed to respond to these particular inquiries. In his email of February 18, 2004, Mr. Dannenberg did advise Ms. Abramtseva that representatives of both parties were expected to appear in court on April 7, 2005.

Upon receiving a copy of Mr. Dannenberg's motion for default judgment with a transmittal letter dated April 25, 2005, the Court memo endorsed Mr. Dannenberg's transmittal letter, asking Mr. Dannenberg to explain why EFC's claim for a breach of contract in 1997 was not barred by the applicable statutes of limitations when brought in a complaint filed on October 15, 2004. (Abramtseva Decl., Ex. L.) By letter dated May 12, 2005, Mr. Dannenberg responded, in part, by stating:

The distinction between a "bar" and an "affirmative defense" to a claim is particularly apt here not only because the defendant willfully defaulted with respect to its obligation to answer the Verified Complaint, but also because plaintiff's reason for waiting as long as

10

it did to initiate legal proceedings was based on the repeated requests of defendant's management, which, over the course of four to five years, beginning in 1998 or 1999, apparently went through a period of revitalizing defendant's business operations while, at the same time, negotiating with plaintiff (which, upon information and belief, was the company's largest creditor) to forebear on collection efforts based on verbal assurances that the amount owed to plaintiff, which was at all times conceded by defendant in verbal communications with plaintiff's principal, would be paid when the company was back on its feet. By 2004, when the company was back on its feet, defendant reneged on its commitment to plaintiff, which necessitated the initiation of the action at bar...I believe that defendant's management has made a conscious decision not to appear in this action, and to allow the judgment by default to be entered, with a view perhaps to renew discussions regarding settlement at such time as plaintiff attempts to enforce such a judgment.[9]

(Dannenberg Letter to the Court, May 12, 2005.)

Upon receipt of Mr. Dannenberg's letter of May 12, 2005, the Court, on May 13, 2005, ordered entry of a default judgment in favor of EFC in the amount of $1,411,707.00, plus prejudgment interest of $921,138.81, for a total of $2,332,845.81. (Abramtseva Decl., Ex. A.) Mr. Kislin also stated that "[d]uring the summer of 2005, after the Judgment was entered, I traveled to Kiev for business unrelated to this action, but while I was there I arranged to meet with Mr. Pilpenko [whom Mr. Kislin understood to be a senior member of Alchevsk's management] at a local restaurant. During our meeting I told Mr. Pilpenko that the Judgment had been entered by this Court in the full amount of the Debt, plus interest." (Kislin Decl. ¶ 28.) At this meeting, Mr. Kislin offered to settle with Alchevsk for half of $1,411,707.00. (11/20/07 Tr. at 84-85.)

Plaintiff also retained Ukrainian counsel, Galina Sabelnikova, to attempt to collect the Judgment. Plaintiff sent the Judgment to counsel in Ukraine for delivery to the Ukrainian Ministry of Justice for service on the Defendant. (Kislin Decl. ¶ 29.) In July 2005, Ms.

---

[9] As will be shown hereafter, there is no testimony that supports Mr. Dannenberg's claim that Defendant reneged on a commitment to Plaintiff in 2004, when, as Mr. Dannenberg claims, the Defendant was "back on its feet, which

11

Sabelnikova served English and Ukrainian translated copies of this Court's Judgment for $2,332,845.81 on the State Executive Department of the Ministry of Justice of Ukraine, with an application that the Judgment be recognized in Ukraine. (Declaration of Galina Sabelnikova dated July 20, 2007 ("Sabelnikova Decl.") at ¶ 5.) Ms. Sabelnikova stated that the State Executive Department of the Ministry of Justice of Ukraine referred her application to the authorized local court in the Lugansk Region, "which has responsibility to determine whether such application should be acknowledged and enforced" (id.), and that "it is the responsibility of the local court to inform the Defendant that the application has been made." (Id.) She did not state, however, whether the local court determined that her application should be acknowledged and enforced, and served on Defendant.[10] (Id.) Nor does Ms. Sabelnikova state that she provided Alchevsk with copies of her application or this Court's judgment.

## II. The Law of Ukraine

Alchevsk has submitted an unrebutted declaration by Dr. Irina Paliashvili, the President and Senior Counsel of the Russian-Ukrainian Legal Group, P.C. and an expert on Ukrainian law, stating that since the contract was entered into by both parties in Ukraine, and required performance in Ukraine, the contract was governed by Ukrainian law. (Paliashvili Decl. ¶ 5.)

Under Ukrainian law, the judgment entered by the "Bankruptcy Court" on January 22, 2004 extinguished EFHL's contract claim. (Id. at ¶ 7.) Paliashvili states that since the Alchevsk

---

necessitated the initiation" of this action.

[10] To supplement her application to the Ministry of Justice, Ms. Sabelnikova also delivered two letters, written by Mr. Dannenberg, to the U.S. Embassy and the U.S. Consul-General, explaining the nature of the Judgment and requesting assistance in enforcing it. (Sabelnikova Decl. at ¶ 6.) Ms. Sabelnikova also declares that "it is [her] understanding" that the Ministry of Justice also contacted a representative of Alchevsk's legal department and informed Alchevsk of the Judgment and her efforts to enforce it on behalf of EFC. (Id. at ¶ 7.) This last allegation is hearsay evidence, and the Court cannot consider it. Mr. Belakh, a member of Alchevsk's legal department, testified that Alchevsk did not receive notice of the default judgment in 2005. (11/21/07 Tr. 144.) Since there was a prior judgment for a lesser amount on the same claim, a determination of non-enforcement is a distinct possibility.

12

bankruptcy proceeding had been initiated, and EFHL had submitted itself to the jurisdiction of the "Bankruptcy Court" by filing a claim in that proceeding for $1,411,706.96 on December 15, 1997 based on the EYA Davidson contract of August 2, 1995; and since the claim of EFHL had been upheld in the bankruptcy proceeding on June 10, 1998; and since a final order or judgment approving the Amicable Agreement of Creditors had been issued on January 22, 2004; under Ukrainian law, EFHL's claim could not be relitigated. (Id. at ¶ 7.)

Furthermore, under Ukrainian law, upon entry of judgment by the "Bankruptcy court," the basis for EHFL's claim was the sum awarded in the Amicable Agreement, and not a claim based on the underlying contract. (Id. at ¶ 7.) Under Ukrainian law, enforcement of the award is subject to the exclusive jurisdiction of the Ukrainian Court (id. at ¶ 5), and under Ukrainian law, a successor in interest, such as EFC, could have no greater rights than the rights of EFHL. (Id. at ¶ 9.) EFHL's new claim under the Amicable Agreement and judgment entered on January 22, 2004 is governed by a three year statute of limitations. [11] (Id. at ¶¶ 10-11.) Thus, under Ukrainian law, EFHL had until March 1, 2007 to present a claim to the Ukrainian court to collect on the bankruptcy award. (Id. at ¶ 11.)

## DISCUSSION

### I.  Applicable Law

#### A.  Setting Aside a Judgment for Fraud on the Court under Rule 60(d)

---

[11] The Court notes, however, that for limited reasons under Ukrainian law, EFC may move to collect its claim for the amount stated in the January 22, 2004 Ukrainian judgment, regardless of the statute of limitations; and if Ukrainian courts find that EFHL's or EFC's reasons for the missed statute of limitations valid, the right to recover is subject to protection pursuant to Articles 275 and 267 of the Civil Code of Ukraine. (Paliashvili Decl., Ex. B at 5.)

13

Pursuant to Fed. R. Civ. P. 60(c)(1), a court generally cannot set aside a judgment for the first three reasons listed under Fed. R. Civ. P. 60(b) more than one year after the judgment was entered. Fed. R. Civ. P. 60(d)(3), however, provides that "this rule does not limit a court's power to...set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3).

It is well established that a court has the inherent power to grant relief from a judgment which has been secured by a "fraud on the court." Fed. R. Civ. P. 60(d)(3). See also Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575 (1946). The concept of "fraud on the court" embraces "only that species of fraud that does, or at least attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery can not perform in the usual manner its impartial task of adjudging cases." 12 Moore's Federal Practice, para. 60.21[4][a] at 60-51 (3d ed. 2007). See also Serzysko v. Chase Manhattan Bank, 461 F.2d 699, 702 (2d Cir. 1972).

An attorney is an officer of the court, and owes the court judiciary duties and loyalty. When an attorney misrepresents or omits material facts to the court, or acts on a client's perjury or distortion of evidence, his conduct may constitute a "fraud on the court." See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944) (finding fraud on the court where the plaintiff's attorney used a fraudulent article to support his claim for patent infringement); H. K. Porter Co. v. Goodyear Tire & Rubber Co., 536 F.2d 1115, 1119 (6th Cir. 1976) (stating that an attorney's knowledge and sponsorship of his client's nondisclosure, misrepresentation, and perjury will constitute a fraud on the court); Kupferman v. Consolidated Research & Mfg. Corp., 459 F.2d 1072 (2d Cir. 1972) (stating that an attorney's intentional failure to disclose the existence of a release, which he knew could be interpreted as a full defense to the plaintiff's

14

claim fits within the concept of fraud on the court).

In Kupferman, the court stated that "[w]hile an attorney should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court." Kupferman, 459 F.2d at 1078 (internal citation omitted).

## B. Representations to the Court under Rule 11(b)

Aside from an attorney's duty of candor as an officer of the court, "Rule 11 [of the Federal Rules of Civil Procedure] imposes a duty on attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and 'not interposed for any improper purpose.'" Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990). Specifically, Rule 11 reads in pertinent part as follows:

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
- (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
- (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
- (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . .

Fed. R. Civ. P. 11(b).

The United States Supreme Court has held that Rule 11 applies not only to attorneys who sign a pleading, motion or other papers submitted to the court, but also to a party represented by counsel. Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533, 551 (1991) ("[W]e hold that [Rule 11] imposes on any party who signs a pleading, motion, or other paper— whether the party's signature is required by the Rule or is provided voluntarily—an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing, and that the applicable standard is one of reasonableness under the circumstances.")

## II. Evaluation of the Conduct of Plaintiff's Counsel

### A. The Filing the Verified Complaint Constitutes a Violation of Rule 11

It is the Court's conclusion that Mr. Dannenberg filed the complaint verified by Mr. Kislin in this action without making "an inquiry reasonable under the circumstances," as required under Rule 11(b). While this conclusion does not serve as the basis of the Court's determination as to whether or not to set aside the default judgment for fraud on the court, it is relevant to the Court's evaluation of Mr. Dannenberg's overall conduct and what he knew at the time of filing the motion for default judgment against Alchevsk on April 20, 2005.

At the hearing before this Court on November 20, 2007, Mr. Dannenberg testified that when Mr. Kislin consulted him about the Alchevsk matter in 2004, Mr. Kislin showed him a copy of the contract, but that Mr. Dannenberg did not read it because it was written in Russian, a language Mr. Dannenberg is unable to read, and that he was not provided with an English translation. (11/20/07 Tr. at 7.) He testified that he drafted the complaint based solely upon what Mr. Kislin told him. (Id. at 8.) Mr. Dannenberg stated, in response to a leading question, that he

16

knew Mr. Kislin to be a reliable reciter of the facts.[12] (Id. at 8.) Mr. Dannenberg then testified that "we had over the years more or less established a course of dealing with one another. It wasn't the first litigation he asked me to handle. And typically we would discuss what happened. I would ask him questions that I thought were relevant. **If there were documents that were available, we'd look at them**. I would typically draft something for him to look at, and we'd put it into final form together." (Id. at 8) (emphasis added.) In proceedings against Alchevsk, however, Mr. Dannenberg and Mr. Kislin did not examine any documents even though, as this opinion will show, documents were available.

Mr. Kislin gave testimony inconsistent with that of Mr. Dannenberg. (Id. at 74.) Mr. Kislin denied that he had the contract with him when he talked to Mr. Dannenberg. (Id. at 75-77.) Mr. Kislin said that he told Mr. Dannenberg the amount of money that was due, but that he did not have the contract, because in Russia and Ukraine, "business is done with a handshake." (Id. at 76.)

Assuming Mr. Dannenberg's testimony that Mr. Kislin had a copy of the contract in Russian with him when he met with Mr. Dannenberg is correct, his conduct in filing the verified complaint, while relying solely on Mr. Kislin's oral representations, does not constitute "a reasonable inquiry under the circumstances." Fed. R. Civ. P. 11. When Mr. Kislin showed him the contract, Mr. Dannenberg was in a position to ask Mr. Kislin, a native of the Ukraine, to read aloud to him the contract, which is only four pages long. (Abramtseva Decl., Ex. B.) To "conduct a reasonable inquiry under the circumstances," Mr. Dannenberg should have requested

---

[12] Mr. Kislin did not prove to be a reliable reciter of facts during the hearing. He misstated facts several times during his testimony or in his Declaration to the Court, and testified he could not remember a number of significant events at issue. See infra at page 22.

17

a copy of the contract, and he could have then obtained a translation before filing the verified complaint. Mr. Dannenberg took none of these actions.

Even assuming Mr. Dannenberg's memory about Mr. Kislin showing him a copy of the contract in Russian or Ukrainian is incorrect, and that Mr. Kislin's testimony is correct that he did not have the contract on hand when he instructed Mr. Dannenberg to file the Complaint, Mr. Dannenberg's conduct still does not constitute "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11. Mr. Dannenberg still should have asked Mr. Kislin to obtain a copy of the contract for him. Furthermore, at the time he drew the complaint, Mr. Dannenberg was aware of Mr. Benninger's role as general counsel to EFC. (11/20/07 Tr. at 6.) Over the years, Mr. Dannenberg had gone to Mr. Kislin's office to notarize "hundreds of documents" (id. at 6), and, at that time, he knew that Mr. Benninger was general counsel who would also spend a "few days a week" in Mr. Kislin's office. Id. at 6. As general counsel, Mr. Benninger would be expected to review and have copies of the corporations' contracts, and in fact, Mr. Benninger knew of the location of translated copies of these contracts. (12/12/07 Tr. at 33-34.) Had Mr. Dannenberg made a simple inquiry of Mr. Benninger he would have learned not only that the contract was a contract of EYA Davidson, a Lichtenstein corporation, but also that EYA Davidson had been merged with EFHL. Mr. Dannenberg made no effort to get a copy of the contract or the translated contract from either Mr. Kislin or Mr. Benninger. Had Mr. Dannenberg read the contract, he would have been aware that it was entered into by EYA Davidson, not Plaintiff EFC; that rights under the contract could not be assigned to another party; and the contract called for all disputes to be arbitrated in the "Arbitration Court" in Kiev.

18

Mr. Dannenberg also testified that prior to the filing of the verified complaint, Mr. Kislin had mentioned that there had been prior litigation in the Ukraine, but said it had not been "successful" in getting Mr. Kislin "a positive result." (Id. at 8-9.) Mr. Dannenberg, however, did not seek any further information about that prior litigation. He testified that he did not know that there had been a prior arbitration proceeding in the Ukraine. (Id. at 8-9.)[13]

Mr. Dannenberg did not investigate the prior litigation Mr. Kislin mentioned. He apparently did not even ask either Mr. Benninger or Mr. Kislin what sort of a proceeding had not gotten "positive results." (11/20/07 Tr. 8-9.) If he had inquired about this of Mr. Kislin or Mr. Benninger, he would have learned of the June 16, 1998 decision which Mr. Kislin had in his possession (Kislin Decl. ¶ 22; 11/20/07 Tr. at 23), and he would have learned that Alchevsk was the subject of a bankruptcy proceeding. Had Mr. Dannenberg conducted these reasonable inquiries, he would have received Mr. Kislin's English translation of the June 10, 1998 decision, and realized that Mr. Kislin's oral representations to him were completely inaccurate, because, contrary to the allegations in the verified complaint, Plaintiff did not enter into a contract pursuant to which Plaintiff, by its agent, EYA Davidson Trading Establishment, was to supply raw materials to Defendant's factory. (Compl. ¶ 10.) The Contract was entered into by EYA Davidson and contains no indication that EYA Davidson was acting as EFC's agent.

---

[13] He also testified that at the time he drafted the complaint, he was not aware EFHL was involved in the transaction (11/20/07 Tr. at 39).

19

(Abramtseva Decl., Ex. B.)[14] All the obligations and rights under the contract were those of EYA Davidson itself.[15] (Id.)

Had Mr. Dannenberg asked Mr. Kislin or Mr. Benninger for a copy of the decisions in the prior litigation in Ukraine, which Mr. Kislin simply told him was "not successful in getting [Mr. Kislin] a positive result." (Tr. 11/20/07 at 9), he would have learned of the bankruptcy proceeding, and further inquiry as to the status of the bankruptcy claim would have revealed the Amicable Agreement approved by the "Bankruptcy Court." Mr. Dannenberg's failure to make these inquiries prior to filing the Complaint was not "an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11.

For Mr. Dannenberg to rely on Mr. Kislin's oral recitation of facts for a complaint to be filed in this Court was irresponsible. English is not Mr. Kislin's first language. At the hearing, he had difficulty expressing himself in English and was often self-contradictory, demonstrated an inability to accurately state facts, and had significant difficulties with his memory. Plaintiff made no effort to show that Mr. Kislin was not suffering from these difficulties at the time the complaint was drawn by Mr. Dannenberg and verified by Mr. Kislin.

## B. The Filing of the Motion for Default Judgment Constitutes Fraud on the Court

The Court concludes that Mr. Dannenberg's motion for a default judgment on April 25, 2005 contained misleading representations to the Court. At that point, Ms. Abramtseva, in her

---

[14] Mr. Dannenberg would have also noted that the decision of the Arbitration Court dated January 16, 1998, that Mr. Kislin, as Investments Director of EYA Davidson, had signed an undated power of attorney allowing Mr. Lcmberg to sign all documents required for the conclusion of the Contract. (Abramtseva Decl., Ex. E at 4.)

[15] Furthermore, had Mr. Dannenberg examined the decision of the Arbitration Court dated January 16, 1998, he would have noted that Trans Commodities Inc., not EFC, had paid the registration fees for EYA Davidson, and that Mr. Lemberg had required that "all the casework materials be sent to the address of the representative office of Trans

20

February 11, 2005 email, had pointed out to him that the contract was between EYA Davidson and Alchevsk, not between EFC and Alchevsk as alleged in the complaint and further that EFHL, as assignee, was the holder of the claim; and Mr. Dannenberg had met with Mr. Kislin to review Ms. Abramtseva's email and had examined the "Bankruptcy Court's" decision of June 10, 1998, which confirmed the statements in her email. An amended complaint should have been filed demonstrating the transfer of the claim from EYA Davidson to EFHL to EFC as well as the pendency of the bankruptcy claim. Instead, Mr. Dannenberg affirmed to the Court that "the complaint, verified by Mr. Sam Kislin, plaintiff's Chief Executive Officer, sets forth the facts upon which an obligation arose on the part of defendant **to plaintiff** as a result of certain goods sold and delivered." (emphasis added.) (Decl. in Supp. of Mot. for Default J.¶ 2.) This statement was false and misleading. At the time, Mr. Dannenberg knew that Mr. Kislin's verification was false. Mr. Dannenberg had met with Mr. Kislin about Ms. Abramtseva's email of February 11, 2005, and Mr. Kislin had shown him "the Bankruptcy Court's" decision of June 10, 1998. (11/20/07 Tr. 23, 46-50.) At that point, Mr. Dannenberg knew that the contractual claims were EYA Davidson's and that the complaint did not "set forth the facts upon which an obligation arose on the part of the defendant to the Plaintiff." Mr. Dannenberg's affirmations to the Court embraced Mr. Kislin's false verification of the complaint, which Mr. Kislin testified that he never read before the evidentiary hearing. (11/20/07 Tr. at 117.) By his Declaration in support of the motion for default judgment, Mr. Dannenberg knowingly sponsored his client's nondisclosure, misrepresentation, and perjury when verifying the complaint. That constitutes a fraud on the court. See H. K. Porter Co., supra, (stating that an attorney's knowledge and

Commodities Inc. in Ukraine" (Abramtseva Decl., Ex. E at 2), a strong indication that if EYA Davidson was acting an undisclosed agent in 1995-1997, it was for Trans Commodities Inc., not EFC.

21

sponsorship of his client's nondisclosure, misrepresentation, and perjury will constitute a fraud on the court); Hazel-Atlas Glass Co. v. Hartford-Empire Co., supra (finding fraud on the court where the plaintiff's attorney used a fake article to support his claim for patent infringement, and stating that fraud on the court is meant to "to prevent unconscionable retention or enforcement of a judgment at law procured by fraud, or mistake unmixed with negligence attributable to the losing party, or rendered because he was precluded from making a defense which he had.").

## C. Mr. Dannenberg's Letter to the Court Dated May 12, 2005 Constitutes Fraud on the Court

Mr. Dannenberg's letter dated May 12, 2005 in response to the Court's statute of limitations inquiry was also deliberately less than candid with the Court. At that time, Mr. Dannenberg had examined the "Bankruptcy Court" decision of June 10, 1998 with Mr. Kislin. (Tr. 11/20/07 at 23.) They were both aware that the EFHL claim, in bankruptcy, of $1,411,707 had been acknowledged by the "Bankruptcy Court." (Id.) Mr. Dannenberg's assertion to the Court that over the course of five years beginning in 1998 or 1999, the Defendant "had been negotiating with Plaintiff...to forebear on collection efforts based on verbal assurances that the amount owed to plaintiff...would be paid when the company was back on its feet" (Dannenberg Letter to the Court, May 12, 2005), avoided disclosure to the Court that the Plaintiff's claim was the subject of a bankruptcy proceeding in Ukraine. It was less than honest dealing with the Court. Kupferman, 459 F.2d at 1170. Having read the Decision of June 10, 1998 before filing the motion for default judgment, Mr. Dannenberg knew that the Defendant was in bankruptcy, that the Defendant would have no reason to "negotiate" with Plaintiff "to forebear on collection efforts" while the acknowledged claim was the subject of a bankruptcy proceeding (Tr. 11/20/07

22

at 23), and that the parties would have had to await settlement with all the creditors and a bankruptcy award for payment to be made. Mr. Dannenberg was aware that Alchevsk's "assurances," if they occurred, were made in the context of a bankruptcy proceeding in the "Bankruptcy Court," and he avoided making that disclosure to the Court. (See Abramtseva Decl. Ex. G.)

As for Mr. Dannenberg's further statement in his letter to the Court that "[b]y 2004 when the company was back on its feet, defendant reneged on its commitment to plaintiff, which necessitated the initiation of the action at bar,"[16] it can only be characterized as another effort to conceal Alchevsk's bankruptcy from the Court. Had Alchevsk's bankruptcy been disclosed or the fact that Plaintiff's claim had been recognized by the Ukrainian "Bankruptcy Court" been disclosed to this Court, the obvious question for this Court to raise—in light of its previous question about the validity of the claim in view of the statute of limitations—would be a question about the nature and result of the bankruptcy proceeding, and whether a stay pending resolution of the bankruptcy claim should be ordered. Thus, Mr. Dannenberg's May 12, 2005 letter caused this Court not to perform in the usual manner its impartial task of adjudging cases. 12 Moore's Federal Practice, para. 60.21[4][a] at 60-51 (3d ed. 2007). This failure to deal with the Court with honesty and integrity perpetrated a fraud on the Court. Kupferman, 459 F.2d at 1078.

## D. EFC's Awareness of the January 22, 2004 Judgment

Furthermore, Mr. Dannenberg's failure to disclose the Alchevsk bankruptcy casts doubt on Plaintiff's claim that in 2005 EFC was unaware of the Amicable Agreement and resulting

---

[16] The record contradicts Mr. Dannenberg's claim that Alchevsk "reneged on its commitment to plaintiff in 2004, necessitating the initiation of the action at bar." Mr. Kislin testified after some equivocation that he had two meetings with Mr. Pilpenko, one in 2005, after the judgment, and the other two or three years before (in 2002 or 2003, not 2004). (11/20/07 Tr. at 105-106.)

23

judgment of the "Bankruptcy Court" on January 22, 2004 requiring Alchevsk to pay creditors 15% in cash and its parent company to pay 85% in securities. (Abramtseva Decl., Ex. I.) Mr. Dannenberg's February 18, 2005 email to Ms. Abramtseva suggests that when Mr. Dannenberg met Mr. Kislin to discuss Ms. Abramtseva's email (11/20/07 Tr. 15, 48), Mr. Kislin advised Mr. Dannenberg of the January 22, 2004 decision by the Bankruptcy Court. At the initial oral argument for Defendant's motion to set aside the Judgment in this Court, the Court expressed skepticism of Mr. Dannenberg's claim the Plaintiff was unaware of the "Bankruptcy Court's" judgment in light of the parties correspondence in February 2005. (8/29/07 Tr. at 16-18.) In his email of February 18, 2005 to Ms. Abramtseva, Mr. Dannenberg had advised her that:

the present claim has been brought in New York because there already were proceedings held before the Arbitration Court [Bankruptcy Court] in Ukraine, but no collection was made on the resulting Award, so now an attempt is being made to enforce the claim in the United States.

(Dannenberg Decl., Ex. A.) At the time of composing that email, Mr. Dannenberg had conferred with Mr. Kislin about Ms. Abramtseva's email of February 11, 2005, and reviewed Mr. Kislin's English translation of the June 10, 1998 decision, which is entitled "Decision" not "Award, and which acknowledged EFHL's claim." (Kislin Decl., Ex. A; 11/20/07 Tr. 23.) In Mr. Dannenberg's email dated February 18, 2005, he stated "but no collection was made on the resulting Award," which strongly suggests that he was referring to the January 22, 2004 judgment since otherwise, there could be no "collection…on the resulting Award."

At the evidentiary hearing, Mr. Dannenberg testified, on direct examination, that when he responded to Ms. Abramtseva's email, using the term "resulting Award," he was thinking of the "Bankruptcy Court's" decision of June 10, 1998, which acknowledged Plaintiff's claim.

24

(11/20/07 Tr. at 23.) This testimony is not credible, however, because one can only "collect" on a monetary judgment.

### Mr. Kislin's Conduct Constituted and Contributed to a Rule 11 Violation

As a represented party who voluntarily signed the verified complaint, Mr. Kislin, like his attorney Mr. Dannenberg, certified to the Court that after conducting a reasonable inquiry he was satisfied that the verified complaint was well grounded. Business Guides, Inc., 498 U.S. at 551. An evaluation of the conduct of Mr. Kislin and his credibility at the evidentiary hearing, however, leads the Court to determine that Mr. Kislin is partially responsible for Mr. Dannenberg's misrepresentations to the Court.

Mr. Kislin verified the complaint filed in this Court stating, "I have read the foregoing Complaint and know the contents thereof; the same are true to my knowledge." (Compl. at 6.) When asked about the content of the complaint at the evidentiary hearing, however, Mr. Kislin testified "I didn't read it." (11/20/07 Tr. at 117). Mr. Kislin's testimony and submissions to this Court show that he is careless with facts and often misleading, and that he relies on suspicion and hearsay. He stated that EYA Davidson "had been **created** to do occasional business on behalf of EFC **and** TCI." (Kislin Decl. ¶ 13) (emphasis added). As stated by Mr. Kislin, this characterization is chronologically incorrect in that EYA Davidson had not been created to do occasional business for EFC because "[i]n 1993 my fellow manager and I created...EYA Davidson" (Id. at ¶8), and "in 1994 I established EFC, a Delaware Corporation." (Id. at ¶ 7.) Only TCI had been created before EYA Davidson. (Id.)

Mr. Kislin also stated that after EFHL and EYA Davidson's claim in Arbitration Court was dismissed on January 16, 1998, "we were advised that a bankruptcy proceeding had been

25

initiated on behalf of Alchevsk as debtor." (Kislin Decl. ¶¶ 20-21.) This is incorrect. Mr. Alyoshin filed a claim in the bankruptcy proceeding on December 15, 1997, a good two months before the January 16, 1998 decision of the Arbitration Court. (Abramtseva Decl., Exs. E and F.)

Mr. Kislin also suggests that Mr. Alyoshin disengaged sometime "**well after**" the 1998 decision acknowledging EFHL's right to pursue its claim against Alchevsk. (Kislin Decl. ¶ 23) (emphasis added). However, Mr. Benninger testified that Mr. Alyoshin resigned "shortly after Alchevsk's application for the denial of the claim in the bankruptcy matter was denied." (12/12/07 Tr. at 17.) As to Mr. Alyoshin resigning upon being retained by Alchevsk, Mr. Benninger testified that "it was disturbing because we again had someone who had **just** won an application for us." (Id.) (emphasis added).

Mr. Kislin asserts that the "Bankruptcy Court's" June 10, 1998 "simply acknowledged EFHL's right to pursue its claim on the Debt in the pending bankruptcy proceeding." (Kislin Decl. ¶ 22.) A more precise statement of the decision is that it acknowledged the property claims of EFHL in the amount of $1,411,706.96. (Id., Ex. A at 3.) ("the debtor...confirmed the existence of the claimed debt under the Contract.")

Mr. Kislin also testified, "I personally never read contracts," (id. at 76) and he stated that he read this contract for the "first time when we received from another party, we received this contract, I read it a few days ago, like two weeks ago, three weeks ago." (Id. at 77.) Mr. Kislin also testified that he "didn't know—didn't remember that in contract it says that I have to—I could not do to transfer [sic] this contract from one party to another party. I don't remember this" (id. at 77), which suggests that he had, in fact, read the contract long before two or three weeks before the November 20, 2007 evidentiary hearing. Furthermore, Mr. Kislin's Declaration

26

of August 7, 2007 suggests that he was instrumental in drawing the contract stating that "there was no reason for us to name any entity to the Contract other than EYA Davison itself." (Kislin Decl. ¶ 13.) (emphasis added).

Whether or not Mr. Kislin had a copy of the contract in Russian when he and Mr. Dannenberg met to initiate the action against Alchevsk, Mr. Kislin engaged in conduct at that time which can only be characterized as deceptive. First, Mr. Kislin did not provide Mr. Dannenberg, as he had in initiating prior litigation, with a copy of the contract (11/20/07 Tr. at 77), nor did he remind him that Mr. Benninger kept copies of the various corporations' contracts. Mr. Kislin, as Chief Executive of the various corporations, had to know that, in order to perform his duties as corporate counsel, Mr. Benninger, who did not speak Russian or Ukrainian, arranged for copies and translations of all contracts to be placed in the corporate files and was familiar with this particular contract and its assignment by EYA Davidson to EFHL.

Secondly, prior to his verification of the complaint, although he advised Mr. Dannenberg that there had been prior litigation in the Ukraine, Mr. Kislin did not provide Mr. Dannenberg with the June 10, 1998 decision of "the Bankruptcy Court," of which he previously had a copy translated into English. (Kislin Decl. ¶ 22.)[17] Instead, he merely told Mr. Dannenberg that there had been "prior litigation in the Ukraine, but it had not been successful in getting him a positive result" (11/20/07 Tr. at 8), which is deceptive since he was aware that the "Bankruptcy Court" had acknowledged the claim in the full amount claimed by EFHL.

Third, Mr. Kislin did not provide Mr. Dannenberg with a copy of the assignment to EFC

---

[17] Mr. Kislin testified that he did not remember if he "told Mr. Dannenberg that a claim had been filed by EFHL in the bankruptcy court" (id. at 110); that he did not remember if he "told Mr. Dannenberg that EFHL had entered into an assignment of its rights against Alchevsk" (id. at 110); and that he did not remember what caused him to make that assignment (id. at 110-111). Mr. Dannenberg testified that at the time he filed the complaint, he was unaware

27

by EFHL dated March 1, 2004 which he had just executed that year so that EFC could bring the action in this country. (Kislin Decl. at ¶ 25.) Indeed, had Mr. Dannenberg been provided with a copy of the March 1, 2004 assignment from EFHL to EFC, Mr. Dannenberg would have become aware that that the claim had been assigned to EFHL, that EYA Davidson was the real party in interest to the contract, and that EFHL had an acknowledged claim in the Ukrainian "Bankruptcy Court." The only conclusion to be drawn from these multiple acts of deception by Mr. Kislin is that he intended that Mr. Dannenberg not be aware of those documents. Had Mr. Dannenberg been aware of any of those documents, the result would have been that Mr. Dannenberg would learn of EFHL's claim in the bankruptcy proceeding; that the claim was EYA Davidson's claim; that EYA Davidson's claim had been assigned to EFHL on April 15, 1998; and that EFHL's claim for $1,411,706.96 had been acknowledged by "the Bankruptcy Court." Disclosure of these facts risked that Mr. Dannenberg would take steps to find out what happened to EFHL's claim in the bankruptcy proceedings and question what support there was for a claim by EFC.

Mr. Kislin testified that he could not remember what caused him to assign the claim against Alchevsk on March 1, 2004 (11/20/07 Tr. 110-11), and maintained that he did not know of the Amicable Agreement and Bankruptcy Court's judgment of January 22, 2004 requiring payment to creditors by March 1, 2004. (Id. at 111.) His claim is that because he felt he would never get justice in the Ukraine, he did not hire a lawyer to replace Mr. Alyoshin (11/20/07 Tr. 102-103, Kislin Decl. ¶¶ 4-5), and thus he was not made aware of the Amicable Agreement and Judgment of January 22, 2004. (11/20/07 Tr. 85-87.) This argument overlooks the fact that in the regular course of business, the Bankruptcy Court would have given notice of those events to

_____

that EFHL was involved in the transaction. (11/20/07 Tr. at 51.)

EFHL's representative in Monte Carlo. (Abramtseva Supp. Decl., ¶ 13.) But, putting that aside, Mr. Kislin had been doing business in the Ukraine since 1990, he is still doing business there (11/20/07 Tr. at 102), and, since 1990, he has maintained a business representative in Kiev, albeit a different person at a different address, at least until early 2005. (Id. at 87-89.) He also testified to hiring lawyers in the Ukraine since 1998. (Id. at 102.) In view of these facts, it is not credible that none of those representatives did not inquire or learn about the Amicable Agreement, and that Mr. Kislin did not know of the Amicable Agreement and the Bankruptcy Court's Judgment of January 22, 2004. The only conclusion to be drawn is that Mr. Kislin did not like the judgment of January 22, 2004 because Alchevsk only paid 15% cash on his claim of $1,411,706.96, and IUD provided the remaining 85% in securities of uncertain value, and because the judgment did not draw interest from 1997 to March 1, 2004. The only reasonable conclusion to be drawn is that Mr. Kislin was unhappy with the Amicable Agreement and "Bankruptcy Court's" judgment of January 22, 2004, and made the assignment to EFC on March 1, 2004 as part of a scheme to get a judgment for $1,411,707.00, with interest, in this country and then bargain with Alchevsk for a settlement for more than 15% of $1,411,707. Indeed, he proceeded to do just that when, a few months after the default judgment for $2,332,845.81 was entered in this Court, he went with that judgment in hand and offered to settle with Mr. Pilpenko of Alchevsk for one half of $1,411,707.00. (11/20/07 Tr. at 84-85.)

\* \* \* \* \*

In view of the proximity of the date of Mr. Kislin's assignment of the Alchevsk claim from EFHL to EFC to the date of the Bankruptcy Court's approval on January 22, 2004 of the Amicable Agreement; Mr. Dannenberg's characterization of the action being brought because

29

Alchevsk was "back on its feet" (Dannenberg Letter to the Court, May 12, 2005); Mr. Kislin's continuous engagement in the same type of business in Ukraine through 2007 (11/20/07 Tr. 102); Mr. Kislin's access to his representatives in Ukraine through 2007 (id. at 87-89); the presumption of court regularity in giving notice to all parties of the Ukrainian judgment of January 22, 2004; and Mr. Dannenberg's use of the phrase "but no collection was made on the resulting Award" in his February 2005 email, following his conversation with Mr. Kislin about the Abramtseva email, the Court concludes that there is clear and convincing evidence that on or prior to March 1, 2004, Mr. Kislin and Plaintiff had knowledge of the Amicable Agreement and "Bankruptcy Court's" judgment on January 22, 2004; and that there is clear and convincing evidence that Mr. Dannenberg presented the complaint to this Court without making an inquiry reasonable under the circumstances, and that he made false and misleading statements to the Court, contrary to his duty of integrity and honest dealing with the Court, Kupferman, 459 2d at 1074, in support of the motion for a default judgment and in his letter to this Court dated May 12, 2005, which prevented the Court from performing "in the usual manner its impartial task of adjudging cases." 12 Moore's Federal Practice, para. 60.21[4][a] at 60-51 (3d ed. 2007), and led the Court to enter the default judgment.

## III. Evaluation of the Conduct of the Defendant

### A. Insufficient Showing of Defendant's Bad Faith

Although Mr. Kislin and Plaintiff claim the Ukrainian "Arbitration Court's" decision of January 16, 1998, denying EFHL's claim because of lack of proof that EFHL was successor in interest to EYA Davidson's claim, was a result of corruption, there is no evidence that Alchevsk acted improperly in connection with that decision of January 16, 1998. Indeed, that decision was

unanimous; not even the arbitrator appointed by EYA Davidson dissented. (See Abramtseva Decl., Ex. E, at 2, 9.) In the arbitration proceeding, Alchevsk's position that EFHL had not shown that it was successor in interest to EYA Davidson had some merit. EYA Davidson's actions in the summer of 1997 raised questions about whether EFHL had become successor in interest to EYA Davidson on April 14, 1997, prior to EYA Davidson's dissolution on April 15, 1997, as alleged by EFHL. (Abramtseva Decl., Ex. D.) Alchevsk had in its possession and presented to the Arbitration Court, the Minutes of Negotiations conducted by Alchevsk and EYA Davidson dated July 29, 1997. (Abramtseva Decl., Ex. E at 4.) Alchevsk also presented the Arbitration Court with Supplementary Agreement #3 to the contract, which was signed by EYA Davidson on July 29, 1997, more than three months after April 15, 1997, the date when EFHL was claiming that EYA Davidson had been liquidated. (Abramtseva Decl., Exs. D and E.) Thus, Alchevsk's contesting of EFHL's rights to the EYA Davidson claim was not without merit.

On June 10, 1998, the Bankruptcy Court issued a decision on EFHL's claim.

(Abramtseva Decl., Ex. G.) Examination of that decision does not show bad faith by Alchevsk. The Bankruptcy Court's decision notes that Alchevsk, the debtor, "confirmed the existence of the proclaimed debt under the contract," but that Alchevsk was claiming that there is no legal successor. (Id. at 1.) As the Court reads this decision, the Bankruptcy Court found that EFHL had proved legal succession and found valid the claim of "Eastern Financial Holdings Limited" Corporation, Monte Carlo, Monaco, in the amount of $1,411,706.96.[18] Again, since Alchevsk recognized the debt as owing but challenged whether EFHL was the legal successor to EYA

_____

[18] The "Bankruptcy Court" did not take into consideration the decision of the International Commercial Arbitration Court under the Chamber of Trade and Commerce of Ukraine, dated January 16, 1998, "because this case has been opined on disputes between the other parties, has been terminated due to the liquidation of the claimant company, and the issue of legal succession had not examined in respect of the claimant due to non-submission by Eastern

31

Davison, evidently based on EYA Davidson's actions after its alleged merger with EFHL, Alchevsk's actions in this regard do not give rise to a finding of bad faith on its part. Furthermore, the decision was favorable to EFHL, so any actions by Alchevsk, in that proceeding, did not harm Plaintiff.

Plaintiff also alleges bad faith on the part of Alchevsk with respect to the Amicable Agreement of the Creditors Committee dated December 25, 2003 (Abramtseva Decl., Ex. H), and the "Bankruptcy Court" decision dated January 22, 2004. (Abramtseva Decl., Exs. H and I.) Plaintiff claims that Alchevsk should have made it aware of these proceedings. (Pl.'s Proposed Findings of Fact and Conclusions of Law (Pl.'s Proposed Findings) at ¶ 46.) Plaintiff also argues that the Defendant intentionally waited until after March 1, 2007 to move to set aside the default judgment, because it had taken advantage of the three year statute of limitation in the Ukraine.

Alchevsk asserts that it made inquiries in 2003 to determine the taxpayer identification number and bank information in the Ukraine used by EFHL in the event the Amicable Agreement came to fruition (Abramtseva Reply Decl. at ¶ 13; Belakh Tr. 11/20/07 at 129-136, Defs.' Hr'g Exs. D, E, F, G, H), and to confirm that the Amicable Agreement correctly listed the address for EFHL. (Abramtseva Decl., Ex. H; Abramtseva Supp. Decl. at ¶ 13.) Ms. Abramtseva also points out that, under Ukrainian law, it was the "Bankruptcy Court's" responsibility, and not Alchevsk's, to give notice to each creditor of the Amicable Agreement and subsequent award of the court. (Abramtseva Supp. Decl., ¶ 13.) Ms. Abramtseva states that Alchevsk cannot establish in fact that the Bankruptcy Court's mailing gave notice to EFHL because it has learned that the practice of the "Bankruptcy Court" is to destroy records of mailing after one year.

Financial Company of the appropriate documents. Id. at 2.

(Abramtseva Supp. Decl., ¶ 13.) Plaintiff offered no rebuttal to either point in Ms. Abramtseva's Declarations.

In light of Mr. Lemberg no longer being employed by EFHL (11/20/07 Tr. at 91), EFHL (as distinguished from EFC (id. at 83)) having no office in Kiev at the time the Amicable Agreement was made in December 2003 and at the time of the judgment affirming the Amicable Agreement in January 22, 2004 (id. at 88); and in light of Ms. Abramtseva's Supplemental Declaration that notice to creditors was the "Bankruptcy Court's" responsibility, not Alchevsk's, there is insufficient evidence that Alchevsk acted in bad faith in not providing EFHL notice of the Amicable Agreement and January 22, 2004 "Bankruptcy Court" judgment. Mr. Kislin's testimony about not being told of the Amicable Agreement by Mr. Pilpenko, whom he understood to be a manager of Alchevsk, in the summer of 2005 is too vague of an account of the conversation to be evidence of bad faith. (Id. at 84-87).

Plaintiff also argues that the February 2005 email exchange between Mr. Dannenberg and Ms. Abramtseva demonstrates bad faith of the Defendant because she did not advise Mr. Dannenberg of the Amicable Agreement or the judgment entered by the Bankruptcy Court on January 22, 2004. (Dannenberg Decl., Ex. A.) Ms. Abramtseva's email to Mr. Dannenberg, translated into English by Mr. Samarsky, indeed made no mention of the Amicable Agreement or the Bankruptcy Court's subsequent decision approving it. (Id.) Instead, Ms. Abramtseva's email focused on the jurisdiction of this Court based on the arbitration provision of the contract, EFC's rights to EYA Davidson's claim based on the arbitration proceeding decision of January 16, 1998, and the assignment of the claim by EYA Davidson to EFHL, not EFC. (Id.) Her email asked if it was possible, since Defendants could not travel to New York within 20 days of service

of process, for the Defendant to write the Court with an explanation of its position on the claim, and if EFHL had a representative in Russia or Ukraine to hold negotiations about the amount owed. (Id.) (emphasis added) As discussed above, Mr. Dannenberg's response to Ms. Abramtseva, which used the term "resulting Award," would lead her to believe, particularly in light of the "Bankruptcy Court's" statutory obligation to notify the creditors, that he was aware of the Amicable Agreement and the "Bankruptcy Court" judgment approving it. Accordingly, Defendant is not shown to have acted in bad faith in failing to advise the Plaintiff of the Amicable Agreement and Judgment in her email.

In his email response to Ms. Abramtseva, Mr. Dannenberg stated, "[i]f you woud [sic] prefer to speak with someone local, Eastern Financial Holdings Limited Corporation/Eastern Financing Corporation has a representative office in Kiev, and I could refer you to an individual there." (Dannenberg Decl., Ex. A.)[19] Defendant does not dispute that it did not reply to Mr. Dannenberg's February 2005 email offering to put the Defendant in contact with a representative in Kiev. However, according to Mr. Sergii Belakh, an attorney employed by the Defendant and the Defendant's only witness at the hearings conducted in this case, the Defendant had attempted to determine whether EFHL had a representative office in Kiev, as stated in Mr. Dannenberg's email, but could not find evidence that EFHL had any office registered to do business in Ukraine. (11/20/07 Tr. 132-135; Hr'g. Ex. D,E,F,G,H.)[20] For Defendant not to attempt to negotiate with an EFC representative in Kiev is understandable, since the Defendant was questioning whether EFC had a right to collect on EFHL's award, and would want confirmation from EFHL, not EFC, that EFC was its successor in interest. Defendant has shown it made efforts to find EFHL in the

_____

[19] In fact, EFHL did not have a representative in Kiev. (11/20/07 Tr. at 88-89.)

34

Ukraine. The Plaintiff's claim that Defendant intentionally allowed the Ukrainian statute of limitations to run before moving to set aside the default judgment of this Court is unsupported by the evidence.

## B. Insufficient Showing of Defendant's Willful Default

Whether the Defendant's failure to appear in this Court, in response to the Summons and verified complaint, was willful[21] is a closer question. The Defendant was aware of its obligation to appear within 20 days of service of the complaint, as shown by Ms. Abramtseva's February 11, 2005 email. Mr. Dannenberg's reply, however, stated that "the current status of the action is that the Court has scheduled what is called a Case Management Conference, at which representatives of both sides are expected to appear…on April 7, 2005." (Dannenberg Decl., Ex. A.) His email made no mention of the necessity of filing an answer, or the likelihood of a default judgment if no answer was filed. Nor is there any evidence of any further communication from Mr. Dannenberg to Ms. Abramtseva warning of the likelihood of a motion for default judgment, or serving notice to her of that motion.

Following the April 7, 2005 conference in this Court, Mr. Dannenberg served and filed a motion for default judgment on Alchevsk's address in Ukraine. (Decl. in Support of Motion for

---

[20] In his Declaration, Mr. Kislin stated that EFHL was registered to do business in Monaco (Kislin Decl. ¶ 9), and he testified that EFHL had no office in Ukraine. (11/20/07 Tr. 88.)

[21] In State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 165 (2d Cir. 2004), the Second Circuit stated that "[w]hen a district court decides a motion to vacate a default judgment pursuant to the provisions of Rule 60(b), the court's determination must be guided by three principal factors: (1) whether the default was willful, (2) whether the defendant demonstrates the existence of a meritorious defense, and (3) whether, and to what extent, vacating the default will cause the nondefaulting party prejudice." Id. at 166-167. Prior to December 1, 2007, setting aside a judgment for fraud on the court was pursuant to Rule 60(b), not Rule 60(d). In this case, the Defendant had a meritorious defense in that the claim had already been decided by the "Bankruptcy Court" in the Ukraine; and the prejudice to the Plaintiff is ameliorated by the fact that the Defendant does not engage in business in this country, does not have assets in this country, and enforcement of the default judgment would be unlikely to have any success in this country or Ukraine.

35

Default Judgment, Ex. C (Dannenberg Decl. of Service dated April 20, 2005); Tr. 11/21/07 at 177-78.) No copy of the motion for default judgment was addressed to Ms. Abramtseva. Accordingly, under these circumstances, the Court finds Plaintiff has not shown willful default by the Defendant.

Defendant's in house attorney Mr. Belakh also testified that the Defendant did not receive notice of the default judgment in 2005. (11/21/07 Tr. 144). He stated that he first learned of the default judgment from a New Jersey Court in February 2007. (Id. at 143-44.) Mr. Belakh testified that he forwarded a letter to the New Jersey Court, stating that the Defendant never received a copy of the judgment, and asking the New Jersey Court to send the Defendant a copy of the default judgment. (Id. at 145, Def.'s Hr'g Ex. J.) In approximately April 2007, the Defendant received a notice of execution on the Court's judgment from an American affiliate, Industrial Group Consortium. (11/21/07 Tr. at 149.) After receiving the notice of execution and the default judgment, Mr. Belakh testified that in May 2007 the Defendant "realized that the case turned into a very unfavorable for us, and we got in touch with our American attorneys so they would help us." (Id.) The Court finds that Mr. Belakh's testimony is credible, and that there is insufficient evidence to support Plaintiff's claim that the Defendant acted in bad faith in an effort to allow the Ukrainian statute of limitations to expire before bringing this motion to set aside the default judgment.

## CONCLUSION

For the reasons set forth above, the Court finds that Plaintiff committed a fraud upon the

Court, and Defendant's motion to set aside the default judgment (Doc# 16) entered on May, 13

2005 is GRANTED.

IT IS SO ORDERED.

Dated: New York, New York
      June _2&#820;P&#820;_, 2008

Robert P. Patterson, Jr.
U.S.D.J.

*Copies of this Opinion and Order sent to:*

## Counsel for Plaintiff

Kestenbaum, Dannenberg & Klein, LLP
104 West 40th Street, 20th Fl.
New York, NY 10018
By:     Jeffrey C. Dannenberg, Esq.
Tel:    212-486-3370
Fax:    212-486-3371

Arnold & Porter LLP
399 Park Avenue
New York, NY 10022
By:     Kent A. Yalowitz, Esq.
Tel:    212-715-1000
Fax:    212-715-1399

## Counsel for Defendant

Greenberg Traurig, LLP
The MetLife Building
200 Park Avenue
New York, NY 10166
By:     Jeffrey R. Mann, Esq.
Tel:    212-801-9200
Fax:    212-801-6400